FILED

2012 Aug-20  PM 04:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| RENASANT BANK, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Case Number  2:11-CV-3924-SLB |
| | ) | |
| LAKE CYRUS DEVELOPMENT | ) | |
| COMPANY, INC.; CONCETTA S. | ) | |
| GIVIANPOUR;  SAEID  C. | ) | |
| GIVIANPOUR, aka Charles S. | ) | |
| Givianpour; THE LAKE CYRUS | ) | |
| MASTER OWNERS ASSOCIATION, | ) | |
| INC., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | | |
| LAKE CYRUS DEVELOPMENT | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| **Counter Claimant,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RENASANT BANK, | ) | |
| | ) | |
| **Counter Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on plaintiff's Motion for Summary

Judgment and Motion for Rule 54(b) Certification, (doc. 21),[1] and Motion to Strike filed by

defendants Lake Cyrus Development Company, Saeid "Charles" Givianpour, and Concetta

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

Givianpour, (doc. 39).    Plaintiff Renasant Bank has sued defendants – Lake Cyrus

Development Company, Inc. [Lake Cyrus]; Concetta S. Givianpour; Saeid C. "Charles"

Givianpour; the Lake Cyrus Master Owners Association, Inc. – to recover on unpaid loans

and for a declaratory judgment regarding the ownership of the developer rights on foreclosed

property.  Upon consideration of the record, the submissions of the parties, the arguments of

counsel, and the relevant law, the court is of the opinion that defendants' Motion to Strike,

(doc. 39), is due to be denied, and plaintiff's Motion for Summary Judgment and Motion for

Rule 54(b) Certification, (doc. 21), is due to be granted.

## I. <u>MOTION TO STRIKE</u>

In their Motion to Strike and Response to Renasant Bank's Supplemental Submissions

in Support of its Motion for Summary Judgment, (doc. 39), defendants contend:

> Pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure,
> Defendants object and move to strike the appraisal reports, as such documents
> are inadmissible hearsay and may not be considered for purposes of proving
> the truth of the matters asserted therein (i.e., the value of the subject
> properties).  See Fed. R. Evid. 802.  Defendants also object on grounds of lack
> of authentication and appropriate foundation for the proffered evidence.

(Doc. 39 at 2.)  Rule 56(c)(2) states, "A party may object that the material cited to support

or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed.

R. Civ. P. 56(c)(2); *see also Jones v. UPS Ground Freight*  (11th Cir. 2012)("The general

rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.

Nevertheless, a district court may consider a hearsay statement in passing on a motion for

summary judgment if the statement could be reduced to admissible evidence at trial or

reduced to admissible form.")(quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322, 1323 (1999)(internal quotations and citation omitted).

Defendants make no argument that the information contained in the appraisal could not "be presented in a form that would be admissible in evidence." Indeed, the court finds that J. Craig Stephens and Travis Brian Prewett, the appraisers, could testify as to their opinions as set forth in the written appraisal.

Because the court finds that the facts set forth in the written appraisals could be presented in an admissible form, defendants' Motion to Strike, (doc. 39), will be denied.

## II. <u>MOTION FOR SUMMARY JUDGMENT</u>

### A. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655(1962) (per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

4

## B.  STATEMENT OF FACTS

Plaintiff has moved for summary judgment as to its breach of contract claims against defendants – Lake Cyrus, Mr. Givianpour, and Ms. Givianpour – based on the notes and guaranties at issue.  According to the Declaration of Jerry Harris, plaintiff's Vice President, plaintiff entered into three loan transactions with these three defendants.  (Doc. 16-1 ¶¶ 2, 3, 8, 13.)

On or about November 8, 2004, plaintiff loaned Lake Cyrus $3.5 million.  (*Id.* ¶ 3.) The loan, referred to by the parties as "Note 1," was guaranteed by Mr. Givianpour and secured by a mortgage.  (*Id.* ¶¶ 3, 6.)  The mortgage gave plaintiff the right to foreclose on the property securing the loan, 44 lots in the Lake Cyrus development, and to sell the property at a foreclosure sale.  (Doc. 16-4 at 7; doc. 20-1 at 2, 15-17.)  Lake Cyrus defaulted on the loan.  (Doc. 16-1 ¶ 4.)  According to plaintiff's Complaint, on July 25, 2011, the balance of Note 1 was $1,084,958.56.  (Doc. 1 ¶ 13.)

On or about April 17, 2006, plaintiff loaned Lake Cyrus $3 million.  (Doc. 16-1 ¶ 8.) This loan, Note 2, was guaranteed by Mr. Givianpour and secured.  (*Id.* ¶¶ 3, 6.)  The mortgage gave plaintiff the right to foreclose on the property securing the loan, 73 lots in the Lake Cyrus development, and to sell the property at a foreclosure sale.  (Doc. 16-1 ¶ 11; doc. 5-2 at 7; doc. 20-2 at 2, 16, 18.)  Lake Cyrus defaulted on the loan.  (Doc. 16-1 ¶ 9.) According to plaintiff's Complaint, on July 25, 2011, the balance of Note 2 was $1,128,197.18.  (Doc. 1 ¶ 20.)

5

On or about July 31, 2006, plaintiff loaned Lake Cyrus, Mr. Givianpour, and Ms. Givianpour $300,000. (Doc. 16-1 ¶ 13.) This loan, Note 3, was secured by a mortgage. (*See* doc. 16-10.) The mortgage gave plaintiff the right to foreclose on the property securing the loan, lots in the Grande View development and property at 4221 Caldwell Mill Road, and to sell the property at a foreclosure sale. (*Id*. at 2; doc. 16-11; doc. 38-1.) Defendants defaulted on the loan. (Doc. 16-1 ¶ 14.) According to plaintiff's Complaint, on July 25, 2011, the balance of Note 3 was $296,818.05. (Doc. 1 ¶ 26.)

On or about November 16, 2010, plaintiff received an appraisal on the 117 Lake Cyrus lots that secured Notes 1 and 2. (Doc. 36-1 at 2.) The appraisal found that the "As Is" market value for the 117 Lake Cyrus lots was $3,620,000, or approximately $30,940.17 each, on November 7, 2010, assuming a bulk sale of the lots and marketing for 6-12 months. (*Id*. at 3, 5; doc. 36-6 at 7.) Defendants contend that the market value of the lots was $70,000 per lot based on prior sales of 12 lots in 2010. (Doc. 39 at 2-3.) Plaintiff's appraisal considered $70,000 to be the "retail lot value" of each lot and the Aggregate Retail Value of the 117 lots to be $8,190,000. (Doc. 36-5 at 7.) However, the appraisal report noted:

> The Aggregate Retail Value reflects only the sum of the retail lot values that could potentially be derived from the sale of the lots at the weighted average retail price of $70,000. It **does not** reflect the discounted bulk-sale value of the lots based on the projected sell-out period. Therefore, it is useful only in establishing lot sale prices and loan reduction amounts. **Under no circumstances can it be considered to represent the market value of the 117 lots in a bulk-sale scenario.**

(*Id.* [emphasis in original].)   The appraisal applied a Discounted Cash Flow Analysis ["DCF"] to determine "the Discounted Value of subject lots to a Single Purchaser (Bulk Purchase.)  That is, all of the lots [were] presumed to be purchased in bulk by one single purchaser.  The Present Value obtained from the DCF analysis reflect[ed] the *market value indication* for the 117 lots under a bulk-sale scenario."   (Doc. 36-6 at 3 [emphasis in original].)  The DCF included the following variables:

- **Lot Prices**:  117 lots at an average price of $70,000 each.  Lot prices are projected to remain stable over the sell-out period.

- **Legal Expenses**:  Estimated at $150 per-lot.

- **Sales/Marketing Expenses**: Estimated at 5.0% of Aggregate Lot Sales Proceeds.

- **Discount Rate Lots**:  Net Cash Flows discounted at 20.0%, with entrepreneurial profit included in the discount rate, . . . and is in the middle of the range of current required discount rates as indicated by *RealtyRates.com*.

- **Compounding Periods**:  Sales are projected to occur semi-annually over a 84-month sell-out period.

- **Lot Taxes**:  During the sell-out period, lots are projected to be taxed at $529.01 per-lot, based on the current average tax rate for the subject lots. . . .

(Doc. 36-6 at 4.)   Based on these factors, the appraisers found as follows:

The subject property consists of 117 lots. Via direct comparison to similar lots sold in the market area, we estimated an average retail value of $70,000 per-lot.  Next, via market comparison to similar subdivisions, we projected an 84-month absorption/sell-out period for the sale of the 117 lots.  Then, utilizing the estimated average retail lot value, we estimated an *aggregate retail value* for the lots of $8,190,000 (**which is not to be construed as the market value**

7

**of the subject lots under a bulk-sale scenario**).  Finally, via [DCF], and utilizing a market-derived discount rate deemed sufficient to attract a knowledgeable investor, we estimated the *market value* of the 117 lots, based on a bulk-sale scenario to a single purchaser.

This analysis produced the "As Is" market value indication for the subject 117 lots assuming that the lots are purchased in bulk by a single knowledgeable investor. The reconciled "As Is" market value indication obtained via the bulk-sale scenario and DCF analysis is $3,620,000 for the 117 lots.

(Doc. 36-6 at 6 [emphasis in original].)

On or about November 12, 2010, plaintiff received an appraisal on the seven Grande View lots.  (Doc. 37 at 2.)  The appraisal found that the "As Is" market value for the seven Grande View lots was $90,000, or approximately $12,857.14 each, on November 7, 2010, assuming the lots were available and marketed for 6-12 months.  (*Id*. at 3, 5.)  The liquidation value of the Grande View lots for the same time period was $65,000.  (*Id*. at 3.)

On or about October 21, 2010, plaintiff received an appraisal on the property on Caldwell Mill Road.  (Doc. 38 at 2.)  The appraisal found that "appraised value of the subject property was $592,000 as of October 20, 2010.  (*Id*. at 8.)  However, this property was foreclosed by the first mortgagee and a second mortgagee received the excess funds after the first mortgage was satisfied.  (*See* doc. 36-4 n.1.)  Plaintiff, the third mortgagee in line received nothing, (*id*.), and its security interest in the Caldwell Mill Road property was extinguished.

On January 19, 2011, plaintiff foreclosed on the property securing the notes and bought the property at the foreclosure sale.  (Doc. 16-1 ¶¶ 7, 12, 16.)  It purchased the

property securing Note 1 for $1.669 million dollars, (*id*. ¶ 7); it purchased the property securing Note 2 for $2.42 million dollars, (*id*. ¶ 12); and, it purchased the property securing Note 3 for $58,500, (*id*. ¶ 16).

According to Harris, "As of February 27, 2012, Lake Cyrus and Charles Givianpour were indebted to Renasant jointly and severally pursuant to Note 1 in the total amount of approximately $1,140,618.79," which included $808,913.31, unpaid principal; 287,998.51, accrued interest; $6,500, appraisal fee; and $36,206.97, "other fees." (Doc. 16-1 ¶ 16.) The interest on this loan accrues at the rate of $84.26 a day. (*Id*.)

As to Note 2, Harris testified, "As of February 27, 2012, Lake Cyrus and Charles Givianpour were indebted to Renasant jointly and severally pursuant to Note 2 and the Guaranty in the total amount of approximately $1,154,855.99," which included $860,470.24, unpaid principal; $283,947.92, accrued interest; $2,100, appraisal fee; and $8,337.83, "other fees." (*Id*.) The interest on this loan accrues at the rate of $83.66 a day. (*Id*.)

And, as to Note 3, Harris testified, "As of February 27, 2012, Lake Cyrus, Concetta Givianpour and Charles Givianpour were indebted to Renasant jointly and severally pursuant to Note 3 in the total amount of approximately $305,246.20," which included $257,828.00, unpaid principal; $38,096.87, accrued interest; $6,775, appraisal fee; and $2,546.33, "other fees." (*Id*.) The interest on this loan accrues at the rate of $26.86 a day. (*Id*.)

Ms. Givianpour calculated the amount due to plaintiff, as of July 25, 2011, as $887,224.93 on Note 1; $837,936.38 on Note 2; and $281,722.33 on Note 3. (Doc. 26-1 at

11.)   The total difference between Ms. Givianpour's calculations and the amount plaintiff claims in its Complaint is $503,090.15.  (*Id.*)

In their Reply Brief, plaintiff contends that this difference results from Ms. Givianpour's failure to include ad valorem taxes paid by plaintiff before foreclosure and interest accruing after July 25, 2011.   (Doc. 27 at 3-4.)   The court ordered plaintiff to supplement its Motion for Summary Judgment with evidence of such taxes and interest and gave defendants a chance to respond.  (Doc. 28.)

Plaintiff submitted the Supplemental Declaration of Jerry Harris, which recalculates the amount owed using numbers submitted by defendants.  (Doc. 29-1.)  Plaintiff contends that defendants have "admitted" these amounts set forth in Ms. Givianpour's Declaration and attached exhibits are owed.  (Doc. 29 ¶ 2; doc. 29-1 ¶¶ 3-5; *see* doc. 26-1.)  Mr. Harris testified as follows:

**Note 1**

| | |
|---|---|
| $2,534,080.51 | Total debt as of January 19, 2011 per Ms. Givianpour (Principal $2,309,000; Interest $225,080.51) |
| ($1,669,000.00) | Foreclosure Bid |
| $ 865,080.51 | Admitted principal as of January 19, 2011 |
| $ 168,913.31 | Past due ad valorem taxes paid and added to principal pursuant to § 7 of Mortgage and Security Agreement (Exh. C to the Declaration of Jerry Harris) |
| $1,033,993.82 | Actual principal as of January 19, 2011 |
| $ 48,755.60 | Interest from January 19, 2011 [at 3.5% = $100.527 per day] until May 22, 2012 (485 days) |

| $ 6,500.00 | Admitted Appraisal Fee |
| --- | --- |
| $1,089,149.42 | Total Amount Due Exclusive of Attorney's Fees |

6.   Attached hereto as Exh. A is a copy of the Title update counsel obtained from Magic City Title Company. It shows past due ad valorem taxes with respect to the real estate securing Note 1.  In January of 2011, I personally went to the Bessemer Courthouse and paid $168,913.31 in past due taxes on the properties securing Note 1.

7. The difference between Defendant's calculations and my calculations is $202,024.48 ($1,089,249.42 - $887,224.93).  On its face the Defendants' calculations omit ad valorem taxes of $168,913.31 that are added to principal and $30,158.10 (300 days x $100.527) interest from July 25, 2011 until May 22, 2012.   The omitted ad valorem taxes and omitted interest total $199,071.41.

8.   When the items omitted by the Defendants are added, the difference between the calculations is $2,953.07.   Defendants admit they owe $1,086,196.35 under Note 1.

**Note 2**

| $3,245,291.66 | Total debt as of January 19, 2011 per Ms. Givianpour (Principal $3,000,000; Interest $245,291.66) |
| --- | --- |
| ($ 2,420,000.00) | Foreclosure Bid |
| $825,291.66 | Admitted principal as of January 19, 2011 |
| $ 280,470.24 | Past due ad valorem taxes paid and added to principal pursuant to § 7 of Mortgage and Security Agreement (Exh. G to the Declaration of Jerry Harris) |
| $1,105,761.90 | Actual principal as of January 19, 2011 |
| $51,425.50 | Interest from January 19, 2011 [at 3.5% = $106.0319 per day] until May 22, 2012 (485 days) |

11

$2,100.00        Admitted Appraisal Fee

$1,159,287.40        Total Amount Due Exclusive of Attorney's Fees

9.    Attached hereto as Exh. B is a copy of the Title update counsel obtained from Magic City Title Company. It shows past due ad valorem taxes with respect to the real estate securing Note 2. In January of 2011, I personally went to the Bessemer Courthouse and paid $280,470.24 in past due taxes.

10.    The difference between Defendant's calculations and my calculations is $321,351.02 ($1,159,287.40 - $837,936.38).  On its face the Defendants' calculations omit ad valorem taxes of $280,470.24 that are added to principal and $31,809.59 (300 days x $106.0319) interest from July 25, 2011 until May 22, 2012.  The omitted ad valorem taxes and omitted interest total $312,279.83.

11.    When the items omitted by the Defendants are added, the difference between the calculations is $9,071.19.  Defendants admit they owe $1,150,216.21 under Note 2.

**Note 3**

| | |
|---|---|
| $328,695.36 | Total debt as of January 19, 2011 per Ms. Givianpour (Principal $302,451.40; Interest $26,243.96) |
| ($58,500.00) | Foreclosure Bid |
| $270,195.36 | Admitted principal as of January 19, 2011 |
| $13,877.60 | Past due ad valorem taxes paid and added to principal pursuant to §§6 and 8 of Accommodation Mortgage and Security Agreement attached hereto as Exh. C |
| $284,072.96 | Actual principal as of January 19, 2011 |
| $13,211.34 | Interest from January 19, 2011 [at 3.5% = $27.24 per day] until May 22, 2012 (485 days) |

12

      <u>$6,775.00</u>     Admitted Appraisal Fee

      $304,059.30     Total Amount Due Exclusive of Attorney's Fees

12.   Attached hereto as Exh. D is a copy of the Title update counsel obtained from Magic City Title Company. It shows past due ad valorem taxes with respect to the real estate securing Note 3.  In January of 2011, I personally went to the Bessemer Courthouse and paid $13,877.60 in past due taxes.

13.   The difference between Defendant's calculations and my calculations is $22,336.97 ($304,059.30 - $281,722.33).  On its face the Defendants' calculations omit ad valorem taxes of $13,877.60 that are added to principal and $8,171.96 (300 days x $27.24) interest from July 25, 2011 until May 22, 2012.  The omitted ad valorem taxes and omitted interest total $22,049.56.

14.   When the items omitted by the Defendants are added, the difference between the calculations is $287.41. Defendants admit they owe $303,771.89 under Note 3.

(Doc. 29-1 at 3-4 [footnotes omitted].)

As a result of its recalculation of the amounts owed, plaintiff asks the court to enter Judgment against plaintiffs for $1,089,149.42, on Note 1; $1,159,287.40, on Note 2; and $304,059.30, on Note 3; with leave to prove attorneys' fees and other costs of collection. (Doc. 29 at 2-3.)

### III.  <u>DISCUSSION</u>

### A.  CALCULATION OF AMOUNT OWED

Plaintiff argues that it is entitled to summary judgment on its claims based on the deficiencies in the three notes with leave to prove other costs and attorneys' fees.  (Doc. 22 at 5-7; doc. 29 at 2-3.)  Defendants contend that an issue of fact exists as to the amount of

deficiencies because, "[T]he Supplemental Declaration of Jerry Harris is apparently inaccurate and unreliable," and plaintiff's "evidence is presented in a conclusory and summary fashion without supporting documents." (Doc. 33 at 6.) The court disagrees.

In his Supplemental Declaration, Mr. Harris testified that he "personally went to the Bessemer Courthouse and paid [the] past due taxes" in the amount of $163,913.31 for the property securing Note 1; $280,470.24 for the property securing Note 2, and $13,877.60 for the property securing Note 3. (Doc. 29-1 ¶¶ 6, 9, 12.) This testimony, which is neither conclusory nor a summary, is sufficient to establish the amount of past due ad valorem taxes paid by plaintiff. Defendants have submitted nothing to rebut Harris's testimony that these are the amounts actually paid to settle the outstanding property taxes.

Therefore, the court finds defendants have not shown any disputed issue of fact with regard to the amount of the property taxes paid by plaintiff.

## B.  FAILURE TO MITIGATE DAMAGES – AD VALOREM TAXES

Defendants argue,

> Although it is unclear when Renasant claims the default occurred, the evidence demonstrates that Renasant did not pay any property taxes until January of 2011, the month it foreclosed. By failing to pay the taxes before such time, Renasant allowed the properties to be sold for taxes, potentially at amounts substantially higher than the actual taxes due, and allowed substantial interest to accrue on the unpaid amounts, thereby substantially increasing the balance due.

(Doc. 33 at 7.)

14

The Alabama Supreme has set forth the general law regarding mitigation of contract damages:

> We begin our analysis by recognizing the long-standing rule that the law imposes upon all parties who seek recompense from another a duty to mitigate their losses or damages.  *Aetna Life Insurance Co. v. Lavoie*, 470 So. 2d 1060 (Ala. 1984).  It is equally well established that a plaintiff can recover only for that damage or loss that would have been sustained if the plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss (*Equilease Corp. v. McKinney*, 52 Ala. App. 109, 289 So. 2d 809 (1974)); and whether the plaintiff has sufficiently mitigated the damages, generally speaking, is a question of fact.  *Carnival Cruise Lines, Inc. v. Goodin*, 535 So. 2d 98 (Ala. 1988).

> Stated otherwise, the injured or damaged party is legally bound to lessen the recoverable damages so far as is practicable by the use of ordinary care and diligence.  Thus, the rule of mitigation requires a party suffering injury, damage, or loss to take reasonable steps to reduce it.

> The rule of mitigation finds its application ***only*** in the context of evidence from which the factfinder may reasonably infer that the claimant ***rejected a reasonable course of action that an ordinarily prudent person would have taken under similar circumstances to minimize the injury, damage, or loss***.  In other words, the party seeking to invoke the rule must meet a threshold "sufficiency of the evidence" test, lest the issue be resolved against the movant as a matter of law.  ***The rule does not apply where the injured party, in an effort to minimize the loss, would be required to incur considerable personal risk or expense with but a slight chance of an alternative recovery***.  *Id*.

*Avco Financial Services, Inc. v. Ramsey*, 631 So. 2d 940, 942-43 (Ala. 1994)(emphasis added).

Defendants have not demonstrated that plaintiff "rejected a reasonable course of action that an ordinarily prudent person would have taken under similar circumstances to minimize the injury, damage, or loss," *Avco Financial Services*, 631 So. 2d at 942, by waiting

until January of 2011 to pay the ad valorem taxes. The court finds that the payment of such taxes was a "considerable expense," and, given the fact that defendants were already indebted to plaintiff, plaintiff would have had no more than a "slight chance" of recovering any ad valorem taxes paid on behalf of defendants. *See id*. at 942-43. Defendants have not presented evidence from which a reasonable jury could find otherwise.

Based on the foregoing, the court finds that there are no questions of fact regarding the amount owed by defendants and that, as of May 22, 2012, the outstanding indebtedness of defendants was $1,089,149.42 on Note 1; $1,159,287.40 on Note 2, and $304,059.30 on Note 3.

## C. MITIGATION – FORECLOSURE SALE

Defendants also contend that plaintiff's Motion for Summary Judgment is premature and that they should be allow the opportunity to conduct discovery as to whether plaintiff has mitigated its damages as to the foreclosure sale. (Doc. 26 at 3, 5.) Specifically, "Defendants question whether Renasant's foreclosure sales were commercially reasonable and whether Renasant made reasonable efforts to sell the foreclosed lots within the year following foreclosure to mitigate its own damages and its deficiency claim." (*Id*. at 4.) Plaintiff contends:

> In the context of a foreclosure sale, the issues of reasonableness of the bid and the mitigation of damages issues are identical. In the absence of collusion, "the purchase price at a properly conducted foreclosure sale is deemed conclusive of the fair and reasonable price at the sale." *Mt. Carmel Estates, Inc. v. Regions Bank*, 853 So. 2d 160, 166 (Ala. 2002). Thus, the foreclosure bid is determinative of the deficiency unless collusion is established. *Id*.

16

(Doc. 27 at 3.)

The court notes that plaintiff failed to note the context of the quote pulled from *Mt. Carmel Estates*.  Indeed, this quote is from the appellee/mortgagee's brief on appeal, and not the court's ruling.[2]  *Mt. Carmel Estates, Inc.*, 853 So.2d at 166.  The *Mt. Carmel* court held the price paid at a foreclosure sale could be "so inadequate as  to raise a presumption of fraud, unfairness, or culpable mismanagement," *id*. at 168 (quoting *Breen v. Baldwin County Federal Savings Bank*, 567 So. 2d 1329, 1333 (Ala. 1990)(citing *Hayden v. Smith*, 113 So. 293 (1927)), before it found that the price paid by the mortgagee was not "so low as to shock the conscience," *id*.

The law in Alabama with regard to foreclosure sales was set forth in the *Hayden v. Smith*, in which the Alabama Supreme Court held:

> The general rule is that, "where the price realized at the sale is so inadequate as to shock the conscience, it may itself raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and therefore be sufficient ground for setting the sale aside."  27 Cyc. 1508.

---

[2]The court noted:

Regions Bank [the appellee/mortgagee] counters that "the purchase price at a properly conducted foreclosure sale is deemed conclusive of the fair and reasonable price at the sale." (Regions Bank's brief, p. 13.)  In support of its argument, Regions Bank cites *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994), *Wood River Development, Inc. v. Armbrester*, 547 So. 2d 844 (Ala. 1989), and *Breen v. Baldwin County Federal Savings Bank*, 567 So. 2d 1329 (Ala. 1990).

*Mt. Carmel Estates, Inc.*, 853 So.2d at 166.

And, although mere inadequacy of price is not sufficient to that end, it is "always a circumstance to be considered in connection with other grounds of objection to the sale, and will be sufficient to justify setting the sale aside, when coupled with any other circumstances showing unfairness, misconduct, fraud, or even stupid management, resulting in the sacrifice of the property." 27 Cyc. 1508; Holdsworth v. Shannon, 113 Mo. 508, 21 S.W. 85, 35 Am. St. Rep. 719, where the subject is discussed quite fully, with a review of many pertinent cases; 2 Jones on Mortgages (6th Ed.) 1670.

The remedial action of courts in such cases is grounded upon the duty of the mortgagee, as stated by Shaw, C.J., in Howard v. Ames, 3 Metc. (Mass.) 311:

"In executing such power, he becomes the trustee of the debtor, and is bound to act bona fide, and to adopt all reasonable modes of proceeding, in order to render the sale most beneficial to the debtor."

The decided cases indicate that in general a price less than one-third of the value of the land will be regarded as grossly inadequate, but, of course, there is no definite rule or basis for such a conclusion, and each case must be judged by its own circumstances.  But, when it is not more than one-tenth of its actual value, we think it is upon its face so grossly inadequate as to shock the judicial conscience and justifies the setting aside of the sale.  And when, in such a case, there was an unsatisfactory publicity in the advertisement because of the obscurity of the newspaper medium, and of its limited circulation both as to readers and municipal territory, coupled with the mortgagor's ignorance of the intended sale, we are convinced that it is the duty of a court of equity to set aside the foreclosure sale, and let in the mortgagor to redeem upon the payment of what is justly due to the purchasing junior mortgagee.

*Hayden v. Smith*, 113 So. 293, 295 (Ala. 1927), cited in *Mt. Carmel Estates, Inc. v. Regions Bank*, 853 So. 2d 160, 168 (Ala. 2002).  "[T]he rule in *Hayden* [that the mortgagee owes the mortgagor a duty of good faith and fairness] is specially applicable where the mortgagee becomes the purchaser at the sale."  *In re Sharpe*, 391 B.R. 117, 154 (Bkrtcy. N.D. Ala. 2008)(quoting *Appelbaum v. First Nat. Bank*, 179 So. 373, 375 (Ala. 1938))(internal

quotations omitted); *see also id*. (quoting *Brabham v. American Nat. Bank of Union Springs*, 689 So. 2d 82, 88 (Ala. Civ. App. 1996).

Defendants do not challenge the foreclosure sale or the bid price for the lots securing Note 3. Therefore, the court will grant plaintiff's Motion for Summary Judgment on Note 3 and enter Judgment against defendants Lake Cyrus Development Company, Saeid "Charles" Givianpour, and Concetta Givianpour on Count III for $291,516.46, plus interest.

The bid prices for the 117 Lake Cyrus lots guaranteeing Notes 1 and 2 were 100% or more than the "As Is" Market Value of the lots. Defendants' evidence that the retail market value of a single lot was more than twice the per lot value of plaintiff's appraisal does not, without more, create an issue of fact as to whether plaintiff acted in good faith and fairly, in conducting the foreclosure sale. Defendants have not questioned the accuracy of the calculations contained in plaintiff's appraisal; indeed, they do not even address the bulk-sale scenario. Also, they have not pointed to any irregularity in the foreclosure proceedings except the difference between the $70,000 per lot price and plaintiff's bid price.

Defendants have not offered evidence on which a reasonable fact-finder could conclude that the foreclosure proceedings were not reasonable. Plaintiff conducted an appraisal to establish the market value of all 117 lots sold to a single purchaser – the bulk purchase. It bought the lots at issue for over 100% of their appraised value.

In response to plaintiff's showing defendants "request an opportunity to conduct discovery" on "issues includ[ing] the adequacy of [plaintiff's] foreclosure bid and whether

it acted reasonably to mitigate its damages." (Doc. 39 at 3.) Rule 56(d) of the Federal Rules of Civil Procedure provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1)  defer considering the motion or deny it;
> >
> > (2)  allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3)  issue any other appropriate order.

Fed. R. Civ. P. 56(d).   Considering defendants' submissions, including the Affidavit of Brenton K. Morris, their counsel, which states that "no discovery has been undertaken in this case," and he "anticipate[s] conducting discovery on issues relating to [plaintiff's] efforts to mitigate its damages," (doc. 26-2 ¶¶ 2, 3), the court finds that defendants have not indicated any issue with regard to plaintiff's foreclosure bid or the conduct of the foreclosure sale.

Defendants argue that plaintiff has not acted reasonably to mitigate its damages.  They contend:

> Renasant apparently engaged in negotiations in 2011 to sell the foreclosed lots to NSH Corp. d/b/a Signature Homes ("Signature"), but did not enter into any contract until December.  [(*See* doc. 12-3.)]  Defendants are not privy to Renasant's efforts to sell the lots, to any negotiations with Signature or any other potential purchaser, or to the financial details of Renasant's deal with Signature.  If given the opportunity to conduct discovery, Defendants may be able to present facts indicating Renasant has failed to properly mitigate its damages.

(Doc. 26 at 4-5.)

20

If plaintiff had sold the mortgaged property within the redemption period, under Alabama law, the difference would be applied to reduce defendant's debt. *See Johnny Ray Sports, Inc. v. Wachovia Bank*, 982 So. 2d 1067, 1074 (Ala. 2007). However, plaintiff had no **duty** to sell the property within the redemption period. *Id*. at 1075-76. Therefore, the failure to sell the property is not relevant to the calculation of defendants' deficiencies and/or plaintiff's mitigation of its damages.

Also, defendants contend:

> Lake Cyrus attempted to purchase the subject property from Renasant within the redemption period. *See* Exhibit A. In December, 2011 or January, 2012, Lake Cyrus offered the amount that Renasant had demanded in exchange for the property and a release of any deficiency claim. However, by that time, Renasant had entered into an agreement (or was in the process of finalizing an agreement) to sell the lots to another buyer.

(Doc. 39 at 3.)

Ms. Givianpour testified that Lake Cyrus had offered plaintiff $4,650,000 for the 117 lots and release from its deficiency balances. (Doc. 39-1 at 2-3.) According to the Complaint, the deficiency balances on all three Notes, together with the foreclosure bids totaled $6,657,473.79 – over $2,000,000 more than Lake Cyrus's offer. Plaintiff has no duty to compromise its claims by $2,000,000. Mitigation does not require a compromise or settlement of plaintiff's claim against defendants. *See Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 859 (Tex. 1999)("[F]oreclosing a plaintiff from pursuing suit is not mitigation. If a defendant is truly offering to mitigate, the offer cannot implicitly or explicitly seek a release of the plaintiff's claims. It must be an unconditional offer to mitigate. (citing *Barrett*

*v. United States Brass Corp.*, 864 S.W.2d 606, 634 (Tex. App. 1993), *rev'd on other grounds sub nom. Amstadt v. United States Brass Corp.*, 919 S.W.2d 644 (Tex. 1996); Restatement (Second) of Contracts § 350 cmt. e, illus. 15 (1981))).

Therefore, the court finds that plaintiff has established that it is entitled to judgment as a matter of law as to Count I and Count II of its Complaint, seeking a deficiency judgment on Notes 1 and 2.  A Judgment in favor of plaintiff and against defendants Lake Cyrus Development, Saeid "Charles" Givianpour, and Concetta Givianpour, will be entered in the amount of  $1,094,175.24, plus interest, on Count I, and $1,164,482.96, plus interest, on Count II.

## IV.  **RULE 54(b) CERTIFICATION**

Plaintiff asks the court to certify as final a judgment in its favor on Count I-III.  (Doc. 21 § 2 [citing Fed. R. Civ. P. 5(b)].)  Rule 54(b) provides:

> When an action presents more than one claim for relief – whether as a claim, counterclaim, crossclaim, or third-party claim – or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

"A district court must follow a two-step analysis in determining whether a partial final judgment may properly be certified under Rule 54(b).  First, the court must determine that

its final judgment is, in fact, both 'final' and a 'judgment.'" *Lloyd Noland Foundation, Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007)(quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980))(internal quotations omitted).  "[T]he court's decision must be 'final' in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action, and a 'judgment' in the sense that it is a decision upon a cognizable claim for relief." *Id*. (quoting *Curtiss-Wright Corp*., 446 U.S. at 7 (citing *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956)))(internal quotations omitted).  "Second, having found that the decision was a final judgment, the district court must then determine that there is no 'just reason for delay' in certifying it as final and immediately appealable." *Id*. (citing *Curtiss-Wright Corp.*, 446 U.S. at 8).  "This inquiry is required because not all final judgments on individual claims should be immediately appealable.  The district court must act as a dispatcher and exercise its discretion in certifying partial judgments in consideration of judicial administrative interests – including the historic federal policy against piecemeal appeals  – and the equities involved." *Id*. at 777-78 (quoting *Curtiss-Wright Corp.*, 446 U.S. at 8 (quoting *Sears, Roebuck*, 351 U.S. at 438))(internal quotations and citations omitted).  The Eleventh Circuit has held:

> The federal concept of sound judicial administration and efficiency will not normally be furthered by having piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case, instead of having the trial judge, who sits alone and is intimately familiar with the whole case, revisit a portion of the case if he or she has erred in part and that portion is overturned following the adjudication of the whole case.  This is particularly true given that the caseload of the federal courts of appeals has grown faster than that of any other component of the federal judiciary.

> Affording Rule 54(b) a liberal construction would only exacerbate the difficulties associated with our burgeoning caseload by promoting multiple appeals in a single case.

*Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 166 (11th Cir. 1997).

Therefore, "Rule 54(b) certifications must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." *Id*. at 166 (quoting *Morrison-Knudsen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981)

In its Motion for Summary Judgment, plaintiff "avers that there is no just reason for delay and that the judgments entered by this Court should be certified as final pursuant to Rule 54(b)." (Doc. 21 at 2.) However, it does not indicate any "pressing need," *Ebrahimi*, 114 F.3d at 166, for a final judgment on less than all claims sufficient to overcome the "historic federal policy against piecemeal appeals," *Sear, Roebuck*, 351 U.S. at 438.

Therefore, plaintiff's Motion for 54(b) Certification, (doc. 21), will be denied.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and plaintiff is entitled to judgment as a matter of law on Count I-III of its Complaint. However, the court finds no pressing need for a Final Judgment on these claims. An Order granting plaintiff's Motion for Summary Judgment, (doc. 21), and denying

24

defendants' Motion to Strike, (doc. 39), and plaintiff's Motion for Rule 54(b) Certification,

(doc. 21), will be entered contemporaneously with this Memorandum Opinion.

    **DONE**, this 20th day of August, 2012.


                                    _Sharon Lovelace Blackburn_
                                    SHARON  LOVELACE  BLACKBURN
                                    CHIEF UNITED STATES DISTRICT JUDGE